1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   United States of America,              )   CR-06-0464-1-PHX-SRB
                                            )
10              Plaintiff,                  )   **ORDER**
                                            )
11  vs.                                     )
                                            )
12                                          )
    Ira W. Gentry, Jr.,                     )
13                                          )
                Defendant.                  )
14                                          )
                                            )
15  _____)

16                    Oh what a tangled web we weave
                      When first we practice to deceive![1]
17

18          The Government seeks detention of Defendant Ira W. Gentry, Jr. ("Gentry") upon

19  the grounds that he is a serious flight risk[2] and that no release condition or combination of

20  conditions exist that would reasonably assure his appearance at future court proceedings. See,

21  the Government's Detention Memorandum (docket # 11), Supplemental Detention

22  Memorandum (docket # 40), Reply To Defendant Gentry's Response (docket # 88) and

23

24  _____

25          [1] Sir Walter Scott (1771 - 1832); http://www.bartleby.com

26          [2] Since none of the crimes charged in the indictment meet the statutory definition of
    "crime of violence" (18 U.S.C. §3156(a)(4)) for purposes of the Bail Reform Act, the
27  Government does not argue as a basis for detention that Defendant is a danger to the
    community. United States v. Twine, 344 F.3d. 987 (9th Cir. 2003); United States v. Byrd,
28  969 F.2d 106 (5th Cir.1992).

1   Supplemental Reply (docket # 89), filed on May 16, 2006, June 20, 2006, September 12,

2   2006 and September 18, 2006, respectively.  After considering the parties' written detention

3   pleadings and attached exhibits, including Defendant's Response To The Government's

4   Detention Memorandum (docket # 70), filed on August 18, 2006; all the evidence and

5   proffers;[3] the arguments of both counsel; the controlling and persuasive authorities on the

6   issues *sub judice* and all the factors set forth in 18 U.S.C. §3142(g), the Court **FINDS** that

7   the Government has proven by a preponderance of the evidence that Gentry is a serious flight

8   risk and that no combination of conditions exist that would reasonably assure his appearance

9   at future court proceedings if released from custody.

10                                **BAIL REFORM ACT OF 1984**

11          "The Bail Reform Act [the "Act"], 18 U.S.C. §§ 3141-3150, authorizes and sets

12   forth the procedures for a judicial officer to order the release or detention of an arrested

13   person, pending trial, sentence, and appeal."[4]  The Act requires a district court to order a

14   defendant detained pending trial if "no condition or combination of conditions will

15   reasonably assure the appearance of the person as required. . . ." 18 U.S.C. § 3142(e); United

16   States v. Gebro, 948 F.2d 1118, 1121 (9th Cir.1991); United States v. Motamedi, 767 F.2d

17   1403, 1405 (9th Cir.1985). "The district court has a duty to engage in a two-step inquiry

18   before ordering a defendant released or detained pending trial." United States v. Hollender,

19   162 F.Supp.2d 261, 264 (S.D.N.Y. 2001); 18 U.S.C. § 3142(b) and (e). First, the district

20   court must make a finding as to whether the defendant presents a "serious risk that such

21   person will flee" if not detained. 18 U.S.C. § 3142(f)(2)(A). "Second, if the defendant is

22

23

24          [3] The detention hearing itself was held September 19, 2006 but the detention ruling
    itself has been under advisement pending the Government's providing the Court and defense
25   counsel with written transcripts for review of those portions of three separate tape recordings
    played in open court which were not clearly audible. Those transcripts were timely received
26   and reviewed.

27          [4] David N. Adair, Jr., Federal Judicial Center, The Bail Reform Act of 1984 (3rd Ed.
28   2006), p. vii.

1    likely to flee, the district court must determine whether some set of conditions would

2    sufficiently vitiate that risk." Hollender, 162 F.Supp.2d. at 264; 18 U.S.C. § 3142(g).

3                    In making the determination whether conditions exist that would reasonably

4    assure a defendant's appearance, Section 3142(g) requires the district court to take into

5    account four statutory factors: (1) the nature and circumstances of the offense charged; (2)

6    the weight of the evidence against the person; (3) the history and characteristics of the

7    person, including his character, physical and mental condition, family ties, employment,

8    financial resources, length of residence in the community, community ties, past conduct,

9    history relating to drug or alcohol abuse, criminal history, and record concerning appearance

10   at court proceedings; and (4) the nature and seriousness of the danger to any person or

11   community that would be posed by the person's release. 18 U.S.C. § 3142(g).  The weight

12   to be accorded to each of these factors rests in the Court's discretion. Hollender, 162

13   F.Supp.2d at 264. The Act, however, mandates release of a defendant facing trial under the

14   "least restrictive" condition or combination of conditions that will reasonably assure the

15   appearance of the defendant as required. 18 U.S.C. § 3142(c)(B); Motamedi, 767 F.2d 1405.

16   The burden of proof rests with the Government which must establish risk of flight by a

17   preponderance of the evidence, not by the higher standard of clear and convincing evidence.

18   Id. at 1406.  Reminding the district courts of the presumption of innocence and its corollary

19   that the right to bail should be denied only for the strongest of reasons, the Motamedi court

20   indicated that"[o]nly in rare circumstances should release be denied," and "[d]oubts regarding

21   the propriety of release should be resolved in favor of the defendant." Id. at 1405, 1407.

22                                    **A. RISK OF FLIGHT**

23                    Gentry is a 50-year old U.S. citizen who is facing, if convicted of all charged

24   crimes, the possibility of spending the rest of his life in a federal prison. The Ninth Circuit

25   permits the district court to consider possible punishment as an incentive for a defendant to

26   flee in assessing a defendant's risk of flight. United States v. Townsend, 897 F.2d 989, 995

27

28

(9th Cir. 1990).[5] The factual background and detailed allegations in this case are imperative in assessing Gentry's risk of flight.

Gentry and a co-defendant Randy W. Jenkins (Jenkins) are accused of master-minding as series of fraudulent schemes, including, among others, the creation and/or use by Gentry of a fictitious identity, false passport and other counterfeit documents to profit from his criminal schemes and thereafter attempt to escape the Government's detection of his significant material gains. The pair are charged in a 59-count federal indictment for conspiracy, securities fraud, wire fraud, tax evasion and various kinds of money laundering, all allegedly occurring from 1997 to 2002. (docket # 3)  The Government also seeks the criminal forfeiture of approximately $8.5 million dollars in U.S. currency and real estate.[6]

---

[5] "[] The defendants are charged with multiple counts, and it is reasonable, from their perspective, to look at the potential maximum sentences they face if they were found guilty on each count and sentenced consecutively on each count. . . Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."

897 F.2d at 995.

[6] A civil in rem forfeiture action was filed by the Government on March 11, 2005 in CV-05-0768-NVW against real property located at 11211 E. Arabian Park Drive, Scottsdale, Arizona. The Government alleges the real property was purchased with proceeds obtained from violations of 18 U.S.C. § 1343 (wire fraud); § 1956/57 (money laundering); and § 15 U.S.C. § 78ff (securities fraud) and, therefore, is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (C). On August 12, 2005, Ira Gentry's counsel filed a Verified Statement of Interest or Right, claiming an interest in the property. (docket # 18)  A Rule 16 scheduling order was entered setting a discovery deadline of January 5, 2007 and a dispositive motion deadline of February 5, 2007.  (docket # 57)  No trial date has been set. Gentry's former counsel, Thomas L. Abram and Hal W. Mack, withdrew from further representation of Gentry on June 5, 2006. (docket # 52 and # 53) Gentry is currently representing himself in this civil litigation.

Gentry informed PTS that he and his wife have resided at 11211 E. Arabian Park Drive, Scottsdale since 2001. (docket # 13 at 2)

- 4 -

1    The Government asserts that the central issue in this criminal case is whether
2    Gentry and Jenkins[7] used numerous domestic and offshore nominee entities and aliases to:
3    1) gain control of millions of shares of stock in a corporation called UniDyn; 2) falsely and
4    fraudulently inflate the value of the stock; 3) secretly sell the stock through Canadian
5    brokerage accounts; and 4) launder the proceeds of the stock sales into nominee bank
6    accounts in and outside of the United States. (docket # 11 at 4) The Government informs the
7    Court that by using Mutual Legal Assistance treaties, it has obtained the Canadian brokerage
8    account records that provide a road map to the stock sale activities orchestrated by Gentry
9    and Jenkins that secretly earned them millions of dollars in income that were never reported
10   to the Government. (Id.)   The Government proffers that bank records and witnesses
11   statements reveal Gentry's and Jenkins' exclusive control over the nominee entities that
12   acquired UniDyn stock. (Id.)  It contends that witness statements and documents establish
13   that Gentry and Jenkins fraudulently inflated the value of UniDyn stock by publicly
14   announcing, through press releases and SEC filings, a 200 million dollar, five-year contract
15   between UniDyn and a Japanese company called Technet regarding the development of a
16   circuit board quality control testing device called the "Sterling." (docket # 88 at 2-3). The
17   Government claims that this contract was a nonexistent illusion created by Gentry. (Id.) The
18   Government claims that a "cut and paste" version of the Technet "contract" was found in
19   Gentry's office after he was terminated by the new CEO of UniDyn. The Government
20   contends there is clear evidence that Jenkins, a disbarred attorney, furthered the scheme by
21   representing himself as a practicing attorney, representing UniDyn, and writing opinion
22   letters on the free-trading value of the stock UniDyn. (Id.)

23           The Government proffers that in December 1997, Gentry merged his Phoenix
24   based computer software business with a public shell entity in order to allow his new

25

26           [7] No issue regarding Jenkins is before the undersigned at this time. Jenkins was
27   detained as a flight risk on June 12, 2006 by Magistrate Judge Edward C. Voss. (docket # 37)
     The fact that Jenkins was detained carries no weight regarding whether Gentry should be
28   detained.

1  company called UniDyn Corp., to meet the requirements to be publically traded. (Id.) The
2  new entity, UniDyn, began trading on the NASD Over-The-Counter Bulletin Board in early
3  1998.  In the initial merger that formed UniDyn, Gentry, with the assistance of Jenkins,
4  placed approximately 15,000,000 shares of the newly-issued UniDyn stock into various
5  offshore entities they had created in order to allegedly disguise their true ownership of
6  UniDyn stock. (Id.)  The Government claims Gentry never disclosed, in either his SEC
7  filings or on his tax returns, his true ownership of UniDyn stock.  Shortly after going public,
8  Gentry became the CEO of UniDyn and started pumping up the value of the stock through
9  knowingly false and misleading press releases and SEC filings of the Sterling device.  (Id.
10  at 5)

11       In 2000, after the UniDyn stock was trading at several dollars per share, Gentry
12  and Jenkins sold through two Canadian brokerage firms 3,000,000 shares of Gentry's
13  undisclosed UniDyn holdings. At the detention hearing the Government contended that
14  Gentry's stock sales resulted in his acquisition of $8,000,000.00.  The brokerage accounts in
15  Canada were opened using offshore entities, aliases, and false passports, created by Gentry
16  and Jenkins. Thereafter, Gentry transferred the money into U.S. bank accounts controlled by
17  Gentry and Jenkins.  (Id.)  After the UniDyn fraud came to light in 2001, UniDyn stock
18  became worthless.  Total losses to the 500 to 1000 UniDyn shareholder victims are estimated
19  between 20 and 50 million dollars. (Id.)

20       The maximum statutory punishments for the various "white-collar" charges range
21  from 5 years in prison for a conviction on the conspiracy charge (Count 1) to a high of 20
22  years imprisonment on each of the eleven (11) International Concealment Money Laundering
23  Class C felonies (Counts 35 through 45) and each of the seven (7) Concealment Money
24  Laundering Class C felonies (Counts 46 through 52).[8]  The Government writes that pursuant
25
26

27       [8] Whether the various counts upon conviction may properly be made consecutive or
28  grouped by closely related counts is beyond the scope of this order.

to United States Sentencing Guideline ("USSG" or "Guideline") §2B1.1 and §2S1.1,[9] after applying the offense characteristics described therein, Gentry is facing a Guideline minimum of 292 months in prison. (Id. at 5) Defense counsel argued at the detention hearing that Defendant's Guideline range is only 63 to 78 months in prison. Even if Gentry is in a Criminal History Category I, he is likely subject to a number of sentencing enhancements upon conviction without consideration of any post-Booker variances:[10] add to the base level of 4 (USSG §2B1.1(a)) 19 levels for loses exceeding 40 million (USSG §2B1.1(b)(1)(T)); an additional 2 levels since the crimes involved more than minimal planning (USSG §2B1.1(b)(4)(A)); add another 2 levels for Gentry's role in the offenses as an organizer or leader (USSG §3B1.1(c)); and an additional 2-levels due to the high number of victims, i.e., "more than one victim." (USSG §2F1.1(b)(2). This unofficial, non-expert Guideline calculation totals a criminal offense level of 29 or a Guideline sentence range of 87 to 108 months on only one of the Class C felonies.  The possibility also exits that Gentry could receive another 2-level enhancement for obstruction of justice (USSG §3C1.1, Application Note 4(f); U.S. v. Jamieson, 427 F.3d 394 (6th Cir. 2005)) if the sentencing judge concludes that Gentry fabricated material false information to a magistrate judge in an attempt to secure his release from custody as discussed hereinafter. To reiterate, Defendant is facing an effective life sentence of imprisonment given his current age (50) if convicted on all counts.

The Government highlights Gentry's recent attempts at deception while he has been incarcerated at CCA for the pending federal charges to demonstrate that he is not

---

[9] The Government does not identify the Guidelines by which it is making this calculation. The district court is required to apply the version of the Guidelines that is in effect at the time of sentencing unless to do so would violate the ex post facto clause of the Constitution. United States v. Steffen, 251 F.3d 1273, 1277 (9th Cir.2001), cert. denied, 534 U.S. 1062, 122 S.Ct. 660, 151 L.Ed.2d 575, 2001 WL 1398654 (2001);18 U.S.C. § 3553(a)(4). Due to the illustrative nature only of the sentencing possibilities herein, this Court will use the Guidelines in effect beginning on November 1, 2000.

[10] United States v. Mohamed, 459 F.3d 979, 987 (9th Cir. 2006) (discusses a sentencing judge's post-Booker discretion to impose additional departures or deviations outside Guideline range pursuant to 18 U.S.C. § 3553(a)).

1  trustworthy and will literally do anything, including conspiring with, at least, his wife to

2  create documents containing false information that puts him in a false light, in order to obtain

3  his release from custody.

4  **1. The Show Horse, Traditional Zippo**

5         Responding to Gentry's denial of purchasing a show horse in 2002 in his

6  responsive detention memorandum,[11] the Government outlines through documents and

7  witness statements Gentry's actual control over the purchase and payment for Traditional

8  Zippo ("Zippo"), a registered quarter horse, using a wire transfer of $120,000.00[12] from a

9  foreign bank account and the horse's subsequent care and maintenance at Gentry's residence.

10  (docket # 89 at 2-4)  Gentry's detention memorandum proffers that Zippo was transferred

11  from Ohio to Florida by "by parties unrelated to Mr. Gentry."  Lynn Gentry, Ira Gentry's

12  wife, at the direction of Ira Gentry,[13] wrote the letter

13

14         [11] Defense counsel wrote: "Mr. Gentry denies buying a show horse in 2002.  Exhibit

15  K [letter of June 6, 2006 from Lynn Gentry to former Gentry attorney, Marc Victor] attached

16  hereto shows neither Mr. Gentry nor his wife knew about any wire transfer involving the

17  horse in question.  Mr. Gentry claims the horse was actually transferred from Ohio to Florida in 2002 by parties unrelated to Mr. Gentry." (docket # at 8)

18

19         [12] The January 17, 2006 letter from Fairfield Federal of Lancaster, Ohio, a financial

20  institution, indicating that Fairfield Federal received a wire transfer of slightly less than $120,000 for the benefit of Quarterdale Farm for deposit into a certain checking account in the name of Suzanne Mazzarini or Fred Mazzarini originating from Hong Kong and Shang

21  Hai Banking Corp, Hong Hai Ltd., London England. (docket # 11, Exhibit ("Exh") 4)  The

22  Government's-prepared money flow chart shows the means by which Gentry funneled or had funneled his ill-gotten money from sales of UniDyn stock in Canada to Hung Hai, Ltd.

23  (docket # 88; Exh. J)  The Court is unable to reconcile the two different spellings of Hung

24  Hai, Ltd.

25         [13] Call # 11496876254802 at 1 Min 49 seconds and 17 Minutes 50 seconds: Recorded

26  telephone conversation between Ira Gentry and Lynn Gentry wherein Ira Gentry instructs Lynn Gentry specifically what limited information to place in the letter, Exhibit K to Gentry's

27  detention memorandum, for the detention hearing:

Ira:      … they got, they got some crazy ass wire transfer stuff, I can't even, I said, 'Look, I

28            don't know anything about that …

1  _____

2  Lynn: Well … it, it's true, but, you know, uh …

3  Ira:    … it won't be able to hold up in court.  And I'm just saying that I just want to get past
        this hearing …

4  Lynn: Well, that's what this is all about, right?  Just for the release hearing …

5  Ira:    … release hearing.

   Lynn: It's not anything that has to do with the trial, am I correct?

6  Ira:    Well, uhm, if the IRS feels that, that uh, that we've received something directly from
        that, those funds and issues …

7  Lynn: hhm-mm … hhm-mm

8  Ira:    … then, then they're going to call it to be a, you know, a problem.  So …

   Lynn: hhm-mm … hhm-mm … well me just writing this letter, I mean, yeah, so I'm saying
9        that, that I didn't; and you didn't.  Whoop-de-do.  They're not going to just go, 'Oh, ok.'

10 Ira:    Well, th-they'll, you know, y-you can, uh make reference to the AQHA records of
        where it went from them to this, to this other entity…

11 Lynn: oh, ok … alright

   Ira:    … you know?

12 Lynn: Alright.

13 Ira:    So that's what you do.  You say, look, this v-, at this time, here's the record that was
        … that was transferred to this ...

14 Lynn: Oh, ok … Ok.  So …

15 Ira:    … from these people.

   Lynn: … so, do you want me to keep this transfer of the report then?  And not give it to
16       Mark?

17 Ira:    Yeah … Well you can, yeah.  You can keep it but, but I don't, I just want to, you
        know, when those funds, whatever, those funds were they, they were, that, that …

18 Lynn: Yeah, I'll write that letter.  I understand that.

   Ira:    … yeah, and just do that part.

19 Lynn: Do you want me to keep the transfer … paper?

20 Ira:    Yeah.

   Lynn: And what about the history showing the chroni- …

21 Ira:    No.

   Lynn: … the chron- No?

22 Ira:    No.

23 Lynn: … (inaudible) should that too?

   Ira:    No. Yeah.  Just …

24 Lynn: Oh for Heaven's sakes.  You could have saved me a whole lot of worry and stress this
        morning …

25 Ira:    Well … well … well, it's just important that, whoever bought that horse, it wa- …

26 Lynn: It's wasn't us.

27 Ira:    … it wasn't us.

   Lynn: It wasn't.

28 Ira:    Well I know that.  And, and that's what, that's the only information I want to give

                                                    - 9 -

1  (Defendant's Exhibit K), stating therein that American Quarter Horse Association ("AQHA")

2

3         them.  I don't want to start givin' them a bunch of other stuff before or after whatever
          happened.
4  Lynn: Ok ... ok … alright …
5  Ira:     … I just want to say at this snap shot here, this is what, you know, this is, this is what's
             understood.  And uh, so, you know, those, those funds weren't authorized or instigated
6            by me or anything else …
   Lynn: Ok.
7  Ira:     … or even know anything
8            like that 'cause, I don't, I didn't have anything to do with it.
   Lynn: Right.
9  Ira:     … and so, uh ...
10 Lynn: Well I can sign it.  Are you going to be able to sign it, or what?  I mean …
   Ira:     No, you can sign it.  You can give it, y-you can give a letter.  And, and uh give it to
11           Mark and say, 'look I've checked up on this, you know, we have an understanding …'
12 Lynn: Ok … hmm-mm … I mean …
   Ira:     … you know, w-we, we know a few people who might've been behind this stuff, you
13           know, but it wasn't us.  But, you know, I mean, I've, I've got my ideas; you know, on
             that kind of stuff.
14 Lynn: And you have to talk to him.  (inaudible)
15 Ira:     Yeah.  I-I, I already have.  I already have talked to him about that.
   Lynn: Ok.  Is he understanding?
16 Ira:     Yeah, so just, you know, p-put the other letter in, in, you know, it's got the date and
17           stuff like that.  I mean, is there any way to uh, to uhm, to just show what, what, what
             needs to be shown, that would be good.
18 Lynn: Ok … Ok
   Ira:     Just the, the, wherever that thing came from to, to that guy and wherever it went,
19           according to those records.  That's all that's nee- …
20 Lynn: Well, I don't know, I don't know anything about the wire and when it …
   Ira:     No, not when … I-I'm not talking anything to do with the wire, I'm talking about that
21           damn horse.
22 Lynn: Well, ok …
   Ira:     That's all I care about.  (inaudible)
23 Lynn: Well, ok.  All I can say is that I received, received, uhm ownership of the horse, uh
          …
24 Ira:     Well that's not what I'm trying to say is, that I don't want you showing that.
25 Lynn: I'm not going to show it.
   Ira:     I know.  But we're talking about it, and I don't want to talk about that.
26 Lynn: Ok.  Alright.

27
   Notice of Filing (docket # 97, call # 2, attached written transcript of June 6, 2006 recorded
28 telephone conversation) (emphasis added)

records show that Zippo was transferred from Kristin S. Mazzarini to "Glenn Connelly" of Florida on January 10, 2002. Lynn Gentry also wrote in the letter: "I, nor my husband have/had any knowledge or control of any wire transfer regarding said horse[,]" referring to $120,000.00 wire transfer to purchase Zippo. (docket # 70; Exh. K)  As seen hereinafter, the Court concludes that this letter is an intentional misrepresentation purposely designed to mislead this magistrate judge from the true facts surrounding the purchase, care and control of Zippo so that Gentry would be released from custody.

The Government informs the Court that federal agents have contacted Sue Mazzarini, the mother of Zippo's registered owner.[14] (docket # 89 at 2-4) Sue Mazzarini stated that her understanding was that Lynn Gentry bought Zippo. The name "Glenn Connelly" was unfamiliar to Sue Mazzarini.  According to Sue Mazzarini, Lynn Gentry and Doug Huls, Gentry's horse trainer, inspected and rode Zippo at the Tampa, Florida horse show around January 1, 2002.  (Id.)  Bruce Vickery, an Ohio horse broker, was Mazzarini's agent for the transaction.  Doug Huls, Gentry's horse trainer, has confirmed to federal agents that Lynn Gentry bought Zippo from Kristen Mazzarini. (Id.)  Mr. Huls stated that he does not know a "Glenn Connelly" and that Huls was personally involved in the negotiations and purchase of Zippo between Lynn Gentry and Mazzarini.  Huls believes that Zippo was shipped from Tampa directly to his stables in Arizona.

Travis Short, an electrician who had resided in a travel trailer behind the Gentry's Glendale residence, was interviewed by federal agents. (Id. at 3)  Mr. Short stated that he was placed as the sole signor on a Antigua bank account at the direction of co-defendant Randy Jenkins. This bank account was opened in December of 2000, and shortly thereafter a deposit of $2,450,000.00 was made into the account.  The account was titled in the name of Hung Hai, Ltd., a Bahamian International Business Company. (Id.)  Mr. Short stated he was also similarly asked to be sole signor on another account with Bank of America in the name of

---

[14] The registered owner, Kristin Mazzarini, was 19 years old in 2002 when the sale took place. (docket # 89 at 2, n. 3)

1    T-Global, Inc.  Mr. Short has stated that he was provided with instructions on the transfers

2    of funds out of both of these accounts exclusively by Gentry. (Id.)  Mr. Short recalled

3    instructing the Antigua bank, at the direction of Gentry, to wire $120,000.00 on January 10,

4    2002 for the purchase of Zippo.  (Id.)

5            The Government indicates that the AQHA records have been obtained by the

6    Government which do show that Zippo was transferred on January 10, 2002 from Kristin

7    Mazzarini to "Glenn Connelly" of Miami, Florida. (Id.)  The street address and phone

8    number for "Connelly" were not listed on the registration form.  According to AQHA

9    records, a "Glenn Connelly" has never registered any other horses and is not a AQHA

10   member.  AQHA records also show that "Connelly" transferred Zippo on January 20, 2002

11   (10 days after he acquired Zippo) to **Lynn Gentry**. (Id.) (emphasis added by the Court)

12   Lynn Gentry paid, with one check, the registration fees for both herself and "Connelly." A

13   query of the Lexis Nexus Law Enforcement Solutions, data base shows that there is no record

14   of a "Glenn Connelly" ever residing in Miami, Florida.[15]  (Id.)

15           The Government also proffers that records from the Hillard Insurance Agency

16   have been obtained by federal agents. (Id. at 3-4)  These records show that Lynn Gentry took

17   out an insurance policy on Zippo on January 3, 2002, some 17 days before she purportedly

18   bought Zippo from "Connelly."  Lynn Gentry indicated on the signed application for the

19   policy that she purchased Zippo on January 3, 2002 from Bruce Vickrey/Agent for

20   $120,000,00.  The $7,710.00 annual premium on the insurance policy was paid by Travis

21   Short out of the T-Global, Inc. bank account. (Id.)  Additionally, Margaret Crumpton, who

22   has known Lynn Gentry since approximately 1997 from their mutual activities with AQHA

23   has signed a verified affidavit (docket # 88; Exh. L) that attests to, among others, that "Lynn

24   Gentry competed with [Zippo] in many horse shows throughout 2002 [and due to Crumpton's

25

26

---

27           [15] LexisNexis Law Enforcement Solutions is a comprehensive data base used to,
     among other things, locate persons or entities.  Using the identifiers of "Glenn Connelly" and

28   similar spellings and Miami, Florida, no records were found.

1   familiarity] with the rules of the AQHA [] only the horse's owner and family can show a

2   horse at AQHA events." (Id. at 1, ¶ 5)

3   **2.  ProTech MGMT, Inc.**

4           The Government also rebuts another Gentry assertion in his Response To

5   Government's Detention Memorandum (docket # 70) and two specific exhibits written on

6   ProTech MGMT, Inc. ("ProTech") letterhead. Exhibit I is a letter addressed to Virginia

7   Mathis, United States Magistrate Judge, that is purportedly signed by Gentry's son, Jacob

8   Gentry, on June 5, 2006.  Exhibit I indicates that "[a]ny and all cash and other assets

9   belonging to ProTech [] are under the control of myself as President[16] Neither [Gentry] nor

10  his wife, Lynn, are officers or director's (sic) of this corporation." (Id; Exh. I) Gentry's son

11  "guarantee[s]" that none of  ProTech's funds will be used for Gentry to flee this federal

12  prosecution. (Id.) Gentry's Detention Memorandum further indicates that "[Gentry] does not

13  own ProTech" and, therefore, Gentry argues, he has no control over the assets of ProTech,

14  such as, money, gold coins and vehicles, to assist him in fleeing the United States pendente

15  lite.  (Id. at 7)

16          The Government provides the Court with a copy of a Chase Bank cashier's check

17  in the sum of $41,376.84, dated April 12, 2006, made payable to Hal Mack, Gentry's former

18  attorney in the civil forfeiture proceedings pending before Judge Wake.[17] (docket # 40;

19  Exh.8)  The remitter on the check is ProTech. Also attached to Exhibit 8 is a handwritten

20  note, purported written and signed by Gentry, which contained at the top of the copy of the

21  cashier's check. It reads:

22

23          Hal,

24  _____

25          [16] Jacob Gentry "believe[s]" he has been President of ProTech for over a year. (docket

26  # 70, Exh. I)

27          [17] See footnote 4, supra. Gentry's former counsel, Thomas L. Abram and Hal W.

28  Mack, withdrew from further representation of Gentry on June 5, 2006. (CV-05-0768-PHX-
    NVW; docket # 52 and # 53)

1
2
3

       By accepting this trust deposit Hal Mack agrees to continue representation of myself, Ira Gentry, and wife, Lynn Gentry, through final outcome of civil and criminal action [r]elating to legal action in progress currently.
       This may be the last $$ I see for a while. Save same $$ for Tom Abram.
       Ira

4    (docket # 40; Exh.8)

5    This exhibit indicates that Gentry has, indeed, much more control over ProTech's assets than

6    Gentry and his son, Jacob Gentry, so-called President of ProTech on April 12, 2006, would

7    have this Court believe. Moreover, Gentry told his wife in another recorded jail conversation

8    what their son, Jacob, should put in the letter.[18]

9

10   _____

11      [18]Ira:   Uhm, yeah, <u>one of the things that you could, uh, Jacob could, if Jacob could write a letter, or whatever, but, you know, say that, we, he went down to, to Panama …</u>

12   Lynn: Yeah, uh-huh
     Ira:   … to uh, to help with uh Y2 with a possible uh …

13   Lynn:  uh-huh
     Ira:   ... manufacturing in their trade zone …

14   Lynn:  Right.
     Ira:   … and uh, you know, and, and, he speaks Spanish and …

15   Lynn:  Yeah.
     Ira:   … I went there to help him on the business side …

16   Lynn: Right.
     Ira:   … and let it go at that.

17   Lynn: Ok, is he going to be on the stand though?
     Ira:   Uhm, that's, that's, that's not determined yet.

18   Lynn: Oh, ok.

19   Ira:   That's not determined yet.
     Lynn: Ok.

20   Ira:   You know, maybe. 'Cause, I mean, that might be uh, he, he might be a good one to

21   put up there.
     Lynn: Ok.

22   Ira:   <u>I think someone needs to say that, you know, that uh, that the company's sorting its

23   things out and, you know, that I'm not going to flee with any assets, they're not going to

24   allow that</u> …
     Lynn: Right, right, I know …

25   Ira:   … and, that, that's pretty much all of it.

26   Lynn: So you're going to talk to Mark to find if …
     Ira:   Yeah.

27   Lynn: … it's going to be …

28   Ira:   Yeah.

The Government's Supplemental Reply details with persuasive supporting exhibits that ProTech acquired $100,000.00 in gold coins in March, 2005, (docket # 11; Exh. 7), and that Gentry himself withdrew $180,000.00 in U.S. currency in December of 2005 from a ProTech bank account. (docket # 11; Exh. 6 [19])  This occurred during the time Gentry claims to have been aware of a criminal investigation into his activities and after his son, Jacob, purportedly became President of ProTech.

The Government claims that ProTech is known to have substantial remaining assets including investments in oil ventures and other assets.  (docket # 89 at 4-5)  ProTech owns, at least, 4 cars, including the 2006 Mercedes that Gentry was driving when he was arrested. The Mercedes was seized and a warrant to search the car's contents found $7,431.00 in currency in the trunk. (Id.)  The Mercedes, as well as other ProTech vehicles, were registered in New Mexico using the address of 1007 Garden Avenue, Roswell, New Mexico. Federal agents contacted Harvey Mardka, the owner of a commercial building at the 1007 Garden address, who told the agents that Gentry had talked to him about leasing his property in late 2003, but never did.  Gentry offers no explanation why cars acquired in Arizona in 2005 were titled and registered out of State with an address unconnected to Gentry or ProTech except, of course, to deceive the Government as to their existence and any relationship to Gentry.

---

Lynn: … the way to go?
Ira:    Yeah.
Lynn: Now when Jacob writes this letter, does he address it to Mark?
Ira:    I don't know.  Wh-who's all these others being addressed to?
Lynn: Well, you told me last night to, to add- …
Ira:    I mean like the character letters, and stuff?  Who're they being addressed to?
Lynn: Uh, 'To whom it may concern' or, or to the judge, Mathis …

Notice of Filing (docket # 97, call # 3, attached written transcript of June 7, 2006 recorded telephone conversation) (emphasis added)

[19] Exhibit 6 is a Cash Transaction Report (CTR) prepared by the bank listing the withdrawal. The CTR lists both a false social security number and false birth date for Gentry.

1    The Court finds that Gentry, his wife, Lynn and their son, Jacob Gentry, are not
2    credible.  The Court agrees with the Government and further finds that Gentry and Lynn
3    Gentry have misrepresented to this Court, at a minimum, their true ownership of Zippo and
4    their lack of knowledge regarding the means used to pay for this $120,000.00 show horse.
5    Their use of the fictitious individual "Glenn Connelly" was an attempt to hide the money trail
6    from Gentry's offshore bank accounts to them.

7    Taken together, the Government's proffers and evidence are more than sufficient
8    to convincingly support a finding that Gentry presents a serious flight risk if released.

9

10   **B. WHETHER CONDITIONS EXIST THAT WOULD REASONABLY ASSURE
     GENTRY'S APPEARANCE**
11   **1. Nature and Circumstances of the Crimes Charged**

12   The Government argues that the charges herein involve sophisticated criminal
13   conduct based on lies and deception, resulting in millions of dollars in losses to nearly 1000
14   victims.  It argues that the documents it has provided to the Court show that Gentry recently
15   traveled to foreign countries, that he has contacts with fugitives in foreign countries, that he
16   has often placed his assets and bank accounts in the names of aliases and nominee entities,
17   and that he used, and has the experience and ability to produce, false identification
18   documents.  (docket # 40 at 4; Exhs 1-19) For example, the Government claims that it has
19   determined that Gentry applied for and established an identification/passport in the name of
20   Don I. Williams for the Kingdom of Kerguelen, [20] a country this Court has never heard of

21

---

22   [20] Kerguelen, a subantarctic island of volcanic origin, is located in the South Indian
23   Ocean, approximately 3,300 mi. (5,310 km) southeast of the southern tip of Africa. It is also
     known as Desolation Island. Kerguelen's weather is harsh, with rain, sleet or snow falling
24   more than 300 days a year; it is not unusual to get snow at sea level in the middle of the
     summer. Winds blow continuously from the west, as the islands lie in the path of the
25   "Furious Fifties." Averaging 68 m.p.h. (110 km/hr) year-round, sustained winds of 93 m.p.h.
26   (150 kph) are commonplace, and gusts of up to 124 m.p.h. (200 kph) have been recorded.
     (docket # 40; Exh. 16) Also see http://www.discoverfrance.net/Colonies/Kerguelen.shtml
27   It appears from this website that Kerguelen is inhabited only by penguins and between
28   50 and 100 scientists and engineers.

- 16 -

before this case. (docket # 11 at 5)  The Government proffers that Gentry utilized this form of identification numerous times to establish bank accounts, title property and identify himself in the name of Don Williams.  (Id; Exh. 1)  On April 13, during a search of Gentry's office at Y2 Ultra Filter, his most recent employer, law enforcement agents seized numerous "Kerguelen" license plates. (Id; Exh. 2)  Also, by way of example, Gentry used the alias Don Williams to purchase a $9,000.00 Rolex watch in April, 2000.  (Id; Exh. 3)  In March, 2000, Gentry also directed that over 6 million shares of UniDyn stock be reissued to Don Williams, and other entities established by Gentry and Jenkins.  (docket # 3, Indictment, ¶ 15)  Gentry purportedly opened a Canadian brokerage account in the name of Prime Security Funding, Ltd. using the alias Don Williams.  (Id., ¶ 37)  Gentry maintained an account at Wells Fargo Bank using a false tax identification number and the alias Don Williams. (Id., ¶ 36(1))

As Gentry points out, none of the federal crimes for which Gentry has been indicted constitute a "crime of violence" as defined by 18 U.S.C. §3156 nor do they involve allegations of drug distribution or the use or distribution of illegal weapons offenses. (docket #70 at 3)  Thus, no rebuttable presumption of detention arises pursuant to 18 U.S.C. §3142(e)(1)(2) that Gentry is a serious flight risk or a danger to the community. None of the pending charges carry a mandatory statutory minimum sentence similar to, for example, 21 U.S.C. 841 were Gentry to be convicted.

Viewing the Government's evidence of Gentry's ability to flee, as the district court similarly did in Hollender,[21] in light of the serious nature and circumstances of the crimes charged,[22] and in view of the substantial risk of flight that they portend, this Court concludes that the first § 3142(g) factor strongly favors the Government and Gentry's continued detention.

**2. Weight of the Evidence against Defendant**

---

[21] 162 F.Supp.2d at 266.

[22] Gentry may also be a target of a State criminal investigation regarding his conduct while President of Y2 Ultra Filter in Tempe. See, footnote 24 infra.

1
2
3

Of the four detention factors a district court should consider, the Ninth Circuit has directed that the weight of the evidence is the least important of the various factors. United Motamedi, 767 F.2d at 1407; United States v. Honeyman, 470 F.2d 473, 474 (9th Cir.1972).

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

The evidence against Gentry appears overwhelming. The documentary evidence of Gentry's fraud and deceit, presented on the issue of detention alone early in the criminal process, is very substantial. In addition to the witnesses already identified herein impeaching Gentry's stories and credibility, the Government has outlined numerous other witnesses who will likely further incriminate him. Greg Dawson, the former father-in-law of Gentry's son, indicated that he had seen an offshore credit card in Gentry's possession, and that Gentry indicated to him that it was used to pay bills.  (docket # 11 at 6)  Nicole Dawson, Gentry's former daughter-in-law, told investigators that Gentry advised Nicole not to use her Social Security Number, and that Gentry had offshore accounts.  (Id.) She also helped Gentry move two boxes of gold coins from Gentry's Glendale home to Tempe, and that Gentry advised her that he kept the gold in case he had to leave.  Gentry also obtained Kurguelen license plates for Nicole and her husband. (Id. at 7)   Kristy Woods, Gentry's former secretary/personal assistant, advised federal investigators that Gentry admitted to her never placing assets in his own name, and that she can avoid paying taxes by never titling anything in her name.  (Id.) She claims that Gentry admitted having money in Belize, and talked about having multiple wives.  Gentry also told John Provazek, former president of UniDyn Corp., that he was "offshore" and that he planned to take a second wife. On August 3, 1994, Gentry sent a letter to the District Director of the IRS, claiming, among other things, that he is not subject to audit or examination authority. (Id. citing Exh. 11)

23
24
25

While the Court continues to presume Gentry innocent of all charges, the Court finds that the second §3142(g) factor strongly favors the Government and a finding that no set of release conditions will reasonably assure Gentry's appearance if released from custody.

26
27

**3.  History and Characteristics of Defendant**

28

The PTS Report (docket # 13), dated May 10, 2006, indicates that Gentry, age 50, was born in North Carolina and is a U.S. citizen. Gentry has lived in Arizona for forty-five (45) years and is in the process of buying a Scottsdale home which is the subject of the pending civil forfeiture proceeding.  Gentry's detention memorandum proffers that Gentry has been happily married for twenty-eight (28) years, and five of his six children reside in Arizona, as do his extended family members. (docket # 70 at 6)  It informs that Gentry is very active in his church and was regularly employed until recently. Gentry represents that he has never suffered from any mental illness, has never tried any illegal substance, and does not partake of alcohol or cigarettes. (Id.)

Many family members and personal friends - who have known Gentry for many years - attest to his strong and high moral character. (Id.; Exh. H)  Numerous letters, typed and handwritten, from people who claim to know Gentry well are attached to Gentry's detention memorandum as Exhibit H.  These letters indicate, among others, that Gentry is a caring father and husband and an exceptionally devout man. (Id.)  The letters further describe him as peaceful, loving, honest and reliable. Gentry is generally portrayed by these letters as a man who would never entertain the notion of running from his legal problems. (Id.)  Bishop Robert Chase, spiritual leader of Gentry's Desert Mountain Ward, writes that Gentry is a member in good standing of The Church of Jesus Christ of Latter-Day Saints.[23]  Gentry's counsel writes that Gentry's primary concern when he was taken into custody was that he would not be able to observe his religious practices that are central to his faith and that Gentry holds leadership positions in his church. (Id.)  Another letter, purportedly written by Charles D. Peacock from Granbury, Texas who claims to have personally lost approximately $100,000.00 by investing in UniDyn stock and who dealt with Gentry as a manufacturer's representative, describes Gentry as "always treating [him] fairly and was honest with all our

---

[23] Bishop Chase's letter, dated June 7, 2006, references an allegation that Gentry "practices polygamy and [that Gentry] would ostensibly leave [flee] Maricopa County to live with members of a polygamous family elsewhere." The Court is unfamiliar with any such allegation in this case except as raised in this letter. The Court's decision herein on detention is not based to any degree whatsoever upon what appears to be a false rumor.

dealings." (Id.)  Mr. Peacock places blame on a person other than Gentry and Jenkins for "the downturn and [his] loss" of his UniDyn stock; otherwise "[he] would not be writing this letter." (Id.)

The Government concedes that Gentry has no prior felony convictions.  Although the Government indicates that Gentry was charged in Maricopa County Superior Court by the Attorney General's Office with felony counts relating to the "alternative fuels" programs, (docket # 11 at 6), Pretrial Services verified that Gentry pled guilty to Attempted Fraudulent Schemes, a Class 1 misdemeanor,[24] and was sentenced on August 30, 2004.[25]  His stipulated sentence was only a terminal disposition with no term of probation, fine or imprisonment. All felony charges were dismissed with prejudice by the Honorable James H. Keppel. There is no evidence that Gentry failed to appear at any of his court appearances in this Maricopa County case as required by the Superior Court or that he violated any of the terms of his pretrial release pending resolution of that matter. It appears that Gentry was charged in this State case on November 3, 2003 and the allegations appear unrelated to the pending federal charges. Gentry has no other known criminal record.

On May 10, 2006 when Gentry was interviewed by Pretrial Services, Gentry was unemployed. (docket # 13 at 2) Gentry advised the PTS' officer that Gentry was CEO/President of Y2 Ultra Filter in Tempe from November of 2001 to April of 2006.[26] (Id.)

---

[24] Under Arizona law, the maximum penalties upon conviction for a Class 1 misdemeanor are six months imprisonment in a county jail and a $2500.00 fine. A.R.S. § 13-707(A) and § 13-802(A).

[25] See, http://www.courtminutes.maricopa.gov; type in Ira W. Gentry

[26] The Government also provides the Court with additional information that, if true, could motivate Gentry to flee the United States.  The Government concurs that Y2 Ultra Filters, a privately held Wyoming corporation located in Tempe, Arizona, employed Gentry as their CEO from 2003 through March of 2006. (docket # 88 at 8) It proffers, however, that "Y2 conducted an internal investigation after Mr. Gentry's employment was terminated and discovered, among other misdeeds, that Gentry had embezzled at least $100,000.00 during his employment at Y2." The Government claims that Y2 corporate officers have contacted Tempe Police, who are conducting an investigation. (Id.; Exh. L, ¶ 19)

Gentry claimed that he resigned from Y2 Ultra Filter in April, 2006 due to the pending federal charges. He also acknowledged that he was previously employed as CEO/President of UniDyn in Phoenix for approximately four or five years. He claimed that "[h]e also resigned from this job [CEO/President of UniDyn] due to allegations related to the instant offense." (docket # 13 at 2)  This is inconsistent with the reasons he himself expressed to the corporate officers in his May 9, 2001 letters. (docket # 70; Exhs. F and G)

The Government impugns the veracity of Gentry's statements to the PTS' officer by informing the Court that federal agents interviewed three of the four board members and officers who were present at the Special Board Meeting conducted in May 2001. (docket # 88 at 5)  The Government indicates that Gentry was fired after the UniDyn Board of Directors discovered the Technet contract was a fraud and that investors had been misled. (Id.)  A series of e-mails from officers and Board members support the concerns and the urgency of the Special Board Meeting. In addition, one Board member took notes of the meeting and surrounding events and wrote a contemporaneous memorandum. (Id.; Exh. I)

While there is an apparent dispute of the real reason Gentry is no longer employed by UniDyn, there is no disputed legal or factual reason why Gentry could not be lawfully employed were he released from custody.

While this Court will not rely on Gentry's word alone that he would comply with all conditions of release in light of his blatant lies identified in this order, the Court concludes that this detention factor weighs in favor of Gentry's release with conditions.

**4. Nature and Seriousness of the Danger to others if  Defendant were Released**

Gentry does not have a serious criminal history. His only conviction was a State misdemeanor, albeit one involving deception, that was neither a crime of violence nor the illegal possession or distribution of drugs or firearms. Gentry does not have an illicit drug or alcohol abuse history. In fact, he does not consume alcoholic beverages at all for religious reasons.  Gentry also voluntarily submitted to drug testing by Pretrial Services shortly after his arrest in this case and tested negative. (docket # 13 at 2)

1    Danger, however, may be assessed in terms other than the use of force or

2    violence.  United States v. Reynolds, 956 F.2d 192 (9th Cir. 1992)(defendant convicted of

3    mail fraud under 18 U.S.C. § 1341 posed an economic or pecuniary danger to the

4    community).  One might argue with legitimate justification from the evidence discussed

5    heretofore that Gentry presents an economic danger to the community were he released from

6    custody. He presents himself as  a person with no employment or prospects of employment

7    and no assets or money to support himself; the Government, however, paints him as a

8    intelligent, deceitful person, sophisticated in the art of deception, capable of conning nearly

9    anything out of anyone, including a federal judge.

10    The Court concludes that this detention factor weighs neither in favor of Gentry's

11    release nor his continued detention.

12                                   **C. DISCUSSION**

13    The Court is mindful that "only in rare circumstances should release be denied,"

14    Sellers v. United States, 89 S.Ct. 36, 38, 21 L.Ed.2d 64 (1968) (Black, J., in chambers);

15    Motamedi, 767 F.2d at 1407, and "doubts regarding the propriety of release should be

16    resolved in favor of the defendant." Herzog v. United States, 75 S.Ct. 349, 351, 99 L.Ed.

17    1299 (1955); United States v. McGill, 604 F.2d 1252, 1255 (9th Cir.1979), cert. denied, 444

18    U.S. 1035 (1980).  Additionally, the Act mandates release of a person facing trial under "the

19    least restrictive" condition or combination of conditions that will reasonably assure the

20    appearance of the person as required. 18 U.S.C. § 3142(c)(2).  Moreover, opportunity to flee

21    is not enough to justify detention as the Act does not seek ironclad guarantees. United States

22    v. Himler, 797 F.2d 156 (3rd Cir. 1986).  The requirement that the conditions of release

23    "reasonably assure" a defendant's appearance cannot be read to require guarantees against

24    flight. United States v. Chen, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992).

25    The Court is also keenly aware that the Government's burden of proof for

26    detaining a person presumed innocent is not trivial and that defense counsel's PTS' statistics,

27    argued at the detention hearing, reflect only 5% or so of the defendants released in the

28    District of Arizona fail to appear at court proceedings as required. The Government must, of

course, point to more than the indictment to justify a defendant's continued detention pending trial.  It must prove by a preponderance of the evidence that a defendant poses a "serious" flight risk and no combination of conditions would reasonably assure his appearance at court proceedings as required. 18 U.S.C. §3142(f)(2)(A)("a serious risk that such person will flee."); <u>United States v. Gebro</u>, 948 F.2d 1118, 1121 (9th Cir. 1991).  Nevertheless, it has done so in this case

The Court finds that detention factors one and two strongly support the Government's arguments that Gentry should be detained; the third factor favors Gentry's release; and the fourth factor does not favor either side. The Court agrees with the Government that Gentry's post-arrest misrepresentations regarding Zippo and ProTech are microscopic insights into a man who is not only willing to go to any length to obtain his release from custody after he has been arrested on serious charges but is also a man, in light of all the evidence, willing and able to engage in significant patterns of deception predicated upon falsehoods, lies and fraudulent documents to accumulate a fortune in cash and other assets, either under an alias or corporations he controls, and thereafter attempt to hide his bounty from the United States Government. Gentry presents as an intelligent, talented man with dramatically diverse personalities: (1) a bright, exemplary side - a man whose family, close friends and church members truly believe he is an honest, spiritual, and law-abiding pillar of our community;  and (2) and a dark side - a man whose greed, avarice and imagination to deceive is seemingly  limitless.

The Court concludes that there are no combination of release conditions that would reasonably assure that Gentry will appear at trial as required given his foreign connections to persons and money; his international travel experience; his proven ability to create and use false identities and identification documents; his remarkable ability to conceal assets both "offshore" and within the United States; and his unusual motivation to go to any length to obtain his release from custody.

Accordingly,

1
2
3
4

      The Court finds that the Government has sustained its burden of proof by a
preponderance of the evidence that Gentry is a serious flight risk and that no condition or
combination of release conditions would reasonably assure his appearance at future court
proceedings were he released.

5
6
7
8

      **IT IS ORDERED** that the Government's oral motion, likely made on May 10,
2006 before a different magistrate judge,[27] and written pleadings seeking the detention of
Gentry (dockets # 11, # 40, # 88 and # 89) are **GRANTED**. Gentry shall remain detained
pending further order of the assigned District Judge, Susan R. Bolton.

9

      DATED this 5th day of October, 2006.

10
11
12
13
14
15
16

_____
Lawrence O. Anderson
United States Magistrate Judge

17
18
19
20
21
22
23
24
25
26
27
28

---

[27] New defense counsel requested the September 19, 2006 detention hearing
immediately upon his appointment on August 23, 2006. (docket # 74)